JOHN W. HUBER, United States Attorney (#7226)
STEWART M. YOUNG, Assistant United States Attorney (#14377)
JENNIFER E. GULLY, Assistant United States Attorney (#15453)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  (801) 524-5682

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALAN EDUARDO CHAVARIN,<br><br>Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | Case No. 2:20-cv-605 DBB<br><br>**UNITED STATES' RESONSE TO MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255**<br><br>Hon. David B. Barlow<br>United States District Judge |

The United States of America ("United States of America") by and through the

undersigned Assistant United States Attorneys, submits the following response to Alan Eduardo

Chavarin's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody

pursuant to 28 U.S.C. § 2255 ("2255 motion"). The United States respectfully requests that the

motion be dismissed.

## PROCEDURAL BACKGROUND

The United States filed a complaint against Mr. Chavarin alleging Possession of Heroin

with Intent to Distribute, a violation of 21 U.S.C. § 841(a)(1). (Case No. 2:16-cr-609, Dkt No.

1

1.[1]) He appeared before Magistrate Dustin B. Pead on November 17, 2016 and Judge Pead appointed Mr. Robert Steele from the Federal Public Defender's Office to represent him. (Dkt. Nos. 5 and 6.)

On November 30, 2016, the Grand Jury returned a one-count Indictment against Mr. Chavarin. Judge Pead arraigned Mr. Chavarin on the  Indictment on that same day. (Dkt. No. 14.) Judge Pead set a two-day jury trial for February 6, 2017. (*Id.*)

On December 27, 2016, Rudy Bautista filed a motion to substitute as counsel for Mr. Chavarin, which was granted by the Court. (Dkt. No. 17 and 19.) Mr. Steele filed a motion to withdraw that was also granted (Dkt. No. 18 and 20.)

Four motions to continue were filed and granted. (Dkt. Nos. 21, 23, 25, and 28.) Two of those motions were jointly filed and both mention, more than once, the on-going plea discussions between the parties. (Dkt. Nos. 25 and 28.)

While the plea negotiations were ongoing, the tentative negotiations included a discussion about likely guidelines calculations and the ten-year mandatory minimum sentence. Specifically, a draft plea agreement sent by the government included a potential base offense level of 32, a recommended three-level departure for acceptance of responsibility along with the potential for an additional two level departure for minor role.  This would have resulted in a Total Offense Level of 25.  The parties understood, however, that the charge carried a ten year mandatory minimum sentence, for which Mr. Chavarin would have no relief. See Exhibits A and B (Emails between AUSA Stewart Young and Rudy Bautista, dated 3.27.17 and 5.3.17). Mr. Chavarin's anticipated criminal history score precluded him from receiving safety-valve, which would have provided potential relief from the ten year mandatory minimum in his case.

---

[1] Unless otherwise noted, all citations are to the criminal case.

Additionally, the government indicated that it would not file an enhancement to Mr. Chavarin's sentence under 21 U.S.C. § 851, which, at the time, would have increased his sentence to a 20-year mandatory minimum.[2] Given the applicable mandatory minimum in the case, the parties never came to any agreement, and therefore no deal was reached.[3]

Throughout 2016, and through to June 2017 as it became increasingly likely that the case would go to trial, Mr. Bautista indicated to the government that he was in contact with his client. At that point, his client communicated to him that he was concerned that the United States would, as a "trial penalty," file a notice of sentencing enhancement pursuant to 21 U.S.C. § 851. Mr. Bautista reached out to the United States about this concern. The United States offered assurance that it would not do so. See Exhibit C. (Email from AUSA Stewart Young to Rudy Bautista, dated 6.12.17.)

Ultimately, at the end of the day, plea negotiations were unsuccessful. Trial in Mr. Chavarin's case commenced on September 19, 2017 before the Honorable Dee Benson. (Dkt. No. 51.)

Mr. Chavarin decided to testify during his case, and took the stand in his defense. (Dkt. No. 52.) He testified that he knowingly transported the drugs but claimed he did so under duress. The jury was excused to deliberate at 11:45 a.m. and returned a verdict of guilty at 3:45 p.m. (Dkt. Nos. 52 and 57.)

Mr. Chavarin received a Presentence Report (Dkt. No. 59.). It established Mr. Chavarin's criminal history category as III (Id. at 5.) The report reflected a final offense level of 34, which

---

[2] At this time, the First Step Act had not yet been enacted, which would have resulted in a 15-year mandatory minimum sentence, instead of a 20-year mandatory minimum sentence.

[3] Of course, offering to debrief and provide substantial assistance to the United States is one way to reach a plea deal with the United States that is below the mandatory minimum. At no point prior to trial did Mr. Chavarin offer to debrief with the government or provide substantial assistance.

reflected a two-point sentencing enhancement under United States Sentencing Guidelines § 3C1.1. (Id. at 4-5.) The resulting guideline range for Mr. Chavarin was 188 months to 235 months.

His counsel filed a Sentencing Memorandum that not only reviewed his theory of the case, but also offered the mitigation evidence for Mr. Chavarin, including the nature of his addiction and the debt that he was facing. (Dkt. No. 64.) It challenged the guideline range established in the PSR on three fronts, and urged the court to depart downward from the established guideline range. (Id. at 6-11.)

The United States also filed a Sentencing Memorandum. (Dkt. No. 66.) It supported the sentencing enhancement and argued that the sentencing factors the court must consider under 18 U.S.C. § 3553(a) fully supported a sentence in the guideline range of 188 to 235 months. Ultimately, the government recommended a low-end guidelines sentence of 188 months.

After extensive discussion, Judge Benson sentenced Mr. Chavarin to 188 months with the Bureau of Prisons on January 4, 2018. (Dkt. No. 67.) The sentence was the low end of the calculated guideline range of 188-235 months in the presentence report based on a sentencing enhancement under United States Sentencing Guidelines Section 3C1.1 for obstruction of justice. (Dkt. Nos. 59 and 67.) Again, after extensive discussion, Judge Benson found that Mr. Chavarin's offense level should be increased under that section because the statements he made at trial constituted an obstruction of justice. (Id.)

At sentencing, Judge Benson found that Chavarin's trial testimony was "bogus," "untrue," "a charade," and "unfounded in fact and in law." (Dkt. No. 87 at 4.) The court concluded that Chavarin's trial testimony constituted "perjury." (Id.) Accordingly, the court applied a sentencing enhancement for obstruction of justice.

4

At sentencing, Chavarin did not object or argue that the court's ruling was insufficiently specific, nor did he raise any of the issues that he is now raising to set aside his judgment.

Mr. Chavarin filed a timely notice of appeal. (Dkt. No. 72.) The only issue on appeal was Judge Benson's imposition of a sentencing enhancement under United States Sentencing Guidelines Section 3C1.1 for obstruction of justice. Based on the facts of the case as they were presented at trial and the important discretion Judge Benson had to weigh those facts and rely on them at sentencing, the United States argued that the enhancement was appropriate. (The United States' appellate brief is attached hereto as Exhibit D.)

The Tenth Circuit denied Mr. Chavarin's appeal and affirmed Judge Benson's reasoned judgment.  (Dkt. No. 87, attached hereto as Exhibit E.)

In its order, the panel noted "the lack of facts corroborating any aspect of Chavarin's duress defense."  (Id. at 14.) It stated that, "Independent of the jury verdict, the district court made findings where it emphasized it strongly believed Chavarin consciously gave false testimony concerning his duress defense." (Id. at 15.) Indeed, the panel emphasized the district court's conclusion that "[Chavarin] chose to go to trial and present an absolutely uncorroborated defense," and then "took the witness stand and actually committed perjury." (Id. at 13.) Therefore, the panel held that "The district court properly applied the enhancement to safeguard the integrity of its proceedings." (Id. at 15.)

Three months later, Mr. Chavarin filed his motion to vacate pursuant to 28 U.S.C. § 2255, the instant case. He now argues that his counsel provided ineffective assistance prior to trial, at trial, and at sentencing. (Case No. 2:20-cv-605, Dkt. No. 1.) The crux of his argument is that his counsel failed to communicate with him and make the right strategic decisions at each stage of his criminal case.

Mr. Chavarin argues he was denied effective assistance of counsel and prejudiced because counsel failed to:

1.  Communicate and provide information to Mr. Chavarin that he needed to assess the government' s case-in-chief, including discovery and other evidence in order for him to make an informed decision as to whether to proceed to trial or plead guilty;

2.  Conduct an adequate and independent pretrial investigation including interviewing any defense or government witnesses ;

3.  Attempt to negotiate a reasonable plea agreement with the government;

4.  Convey his trial strategy and inform Mr. Chavarin of any affirmative defenses;

5.  Prepare for trial and research the applicable law and review the discovery provided by the government;

6.  Subpoena or call any defense witnesses;

7.  Lodge proper objections;

8.  Act as an effective advocate at trial;

9.  Review, discuss or explain the Presentence Report;

10.  Object and argue for mitigation of Chavarin's sentence; and,

11.  Argue that Chavarin's sentence was substantively unreasonable.

*See id.* at 2.

## **RELEVANT FACTS**

### A.    Chavarin transported 8.4 pounds of heroin hidden inside the spare tire of a rental vehicle

On November 11, 2016, on I-80 eastbound at approximately milepost 166, Utah Highway Patrol Lieutenant Steve Salas conducted a traffic stop of a black SUV.[4]  Lieutenant Salas stopped the vehicle for following too close and for improper lane travel.  When he approached the vehicle, he found Mr. Chavarin as the sole occupant and driver of that vehicle. Mr. Chavarin handed Lieutenant Salas an Arizona identification card in his name.  Mr. Chavarin could not provide a rental contract; he said it was rented by his girlfriend.  While talking to Mr. Chavarin, Lieutenant Salas could smell a strong odor of air freshener and saw an air freshener in the rear view mirror, both of which are common in vehicles transporting narcotics.

Lieutenant Salas invited Mr. Chavarin back to his patrol vehicle while he filled out the citation for the traffic stop.  He opened up a citation on his computer and talked to Mr. Chavarin while filling it out.  Mr. Chavarin said his license was suspended and also mentioned he had been arrested previously for transporting drugs.  He also told Lieutenant Salas that he was currently on probation. Mr. Chavarin denied that any drugs were in the vehicle.  When asked about current warrants, Mr. Chavarin said he didn't know if he had any outstanding.

During his conversation with Lieutenant Salas, Mr. Chavarin consented to Lieutenant Salas' search of the vehicle.  Lieutenant Salas began the hand search around 8:00pm.  He then noticed very few items in the vehicle and decided to deploy his narcotics K-9.  At 8:01pm, Lieutenant Salas deployed his K-9 around the vehicle.  The K-9 did not alert to the outside of the vehicle.  Lieutenant Salas then opened the rear hatch of the SUV and placed his NDD inside the

---

[4] This summary of facts is taken, generally, from the United States' Sentencing Memorandum. (Dkt. No. 66.)

rear cargo area.  The K-9 immediately alerted to the odor of narcotics on the floor of the cargo space.  Lieutenant Salas searched the rear cargo area of the SUV and began to concentrate on the spare tire.  Eventually, a density test was conducted on the spare tire, demonstrating that it was not hollow like a normal tire.  After cutting into the spare tire, Lieutenant Salas and others found some cloth in the spare tire and five packages of suspected heroin weighing approximately 8 pounds.

During the K-9 sniff, Trooper Jared Withers had shown up and talked to Mr. Chavarin. Chavarin told him that he ate about ½ gram of heroin while Salas attempted to stop him.  Summit County EMS arrived on the scene and evaluated Mr. Chavarin, after which they cleared him medically.

**B.     During police interview, Mr. Chavarin admitted to knowingly transporting heroin**

Post-*Miranda*, Mr. Chavarin initially denied knowing there was large amount of heroin in his vehicle and said he was heading to Cheyenne, Wyoming, to meet a girl he met online at a gas station for a few hours and then return home to Phoenix, driving both ways in the vehicle rented by his girlfriend.

Eventually, after the drugs from the spare tire were processed, however, Mr. Chavarin admitted that he was actually heading to Kansas City instead of Cheyenne. Mr. Chavarin suggested that he was interested in discussing the case further. He told officers he was working for an organization and that he was making this drug run to "square up" his debt with them.

Mr. Chavarin also provided consent to search his cell phone and agents recovered messages regarding the sale of narcotics. But he ultimately expressed fear that he would be killed if he cooperated with police.  He then declined to speak with agents further.

During his time speaking with agents, he did not say he had been threatened, or coerced into transporting the heroin, nor did he express fear of the organization he was working for.

Testing later confirmed the packages contained 8.4 pounds of heroin.

### C.      Mr. Chavarin's Duress Defense

Three days before the beginning of trial, Mr. Chavarin's counsel noticed the Court and counsel that Mr. Chavarin would present a duress defense. At the outset of his opening statement, defense counsel told the jury that "this is not a case of who did it or how it was done." Trial Tr. at 91.[5] Defense counsel admitted that "[e]verything that was just told to you happened," that Mr. Chavarin was indeed "driving a car from Glendale, Arizona, to Kansas City knowing that there were drugs in it with the intent to give it to another person to distribute." *Id.* at 91.

Defense counsel then argued that what mattered was "why he did it." *Id.* at 92. Counsel claimed that Mr. Chavarin only agreed to transport the drugs because he was threatened by an enforcer from a drug cartel. *Id.* at 93. Counsel argued that Mr. Chavarin should be acquitted because he acted under coercion or duress. *Id.* at 2.

Mr. Chavarin testified to support his defense. In direct examination, Mr. Chavarin testified that he was addicted to heroin and sometimes delivered drugs to pay off his drug debts. *Id.* at 201-04. Mr. Chavarin testified that, a few years earlier, he been caught by police while attempting to deliver drugs, and that after he was released from jail, enforcers from a cartel informed him that he owed the cartel money for the drugs that were lost in the failed drop-off. *Id.* at 205-07. Mr. Chavarin said that when he couldn't pay, a "guy named Chewy" gave him drugs

---

[5] Record citations will be to the Volume # from the Record on Appeal, followed by the consecutively paginated page number (e.g., Vol. I at ___). The trial transcripts are split between Volumes I and III of the ROA, but they are consecutively paginated as to the trial itself and filed on the criminal docket. (Dkt. Nos. 76, 77, and 78.) The United States will cite to them using their internal consecutive pagination as Trial Tr. at ___. The transcript from the sentencing hearing is in ROA Volume III (Dkt. No. 78.) The United States will cite to it as Sent. Tr. at ___.

to sell so that he could pay off the debt. *Id.* at 207. Mr. Chavarin claimed that he soon began

using drugs again—thus increasing his debt—and that he eventually owed the cartel $4000. *Id.* at

209.

Mr. Chavarin testified that the cartel soon began threatening him because of this debt. He

said that he received "at least a phone call a day" and that "mysterious cars were parked in front

of [his] house." *Id.* He claimed that at one point "[t]hey broke into the house" and "flipped

everything upside down" to "send[ ] a message." *Id.* Mr. Chavarin then claimed that cartel

enforcers ordered him to transport drugs from Arizona to Kansas City to pay off his debt. *Id.* at

213. He said that the cartel threatened his life, the life of his fiancée and her family in Arizona,

and the life of his family in Mexico. *Id.* at 210-11, 212, 215. He thus claimed that he did the drug

run "because I was forced to." *Id.* at 216.

In cross-examination, Mr. Chavarin admitted that he had repeatedly lied to police officers

after being pulled over. *Id.* at 220, 223. He said that he did so because he was trying to avoid jail.

*Id.* at 225. He failed, however, to provide any helpful details relating to the alleged duress.

When pressed for details on the alleged threats, Mr. Chavarin claimed that "Chewy's"

real name was Jesus Gonzales and that the threats occurred about a month before he was caught

driving through Utah with the drugs. *Id.* at 228, 231. Mr. Chavarin said that he was threatened

while he "was in the street," but he was unable to give any more specific details, such as where

he was (or which street he was on) when this occurred. *Id.* at 232. Mr. Chavarin also admitted

that he never told officers about the alleged threats after he was arrested. *Id.* at 238, 242.

Before trial, the United States had objected to Mr. Chavarin's request for a coercion

instruction. *See* Vol. I at 151-54. At the close of evidence (and outside the presence of the jury),

the district court agreed to give the instruction. But the court commented that Mr. Chavarin's

testimony had a "lot of generalizations," was "very light on specifics," and had been developed "through a fairly effective use of leading questions" from defense counsel. *See* Trial Tr. at 253-54. The court also observed that Mr. Chavarin's "willingness to cooperate" with officers on the night of the arrest "seem[ed] inconsistent with a gun to the head, figuratively speaking, to his family in Mexico and his fiancée and others." *Id.* at 254. Despite its reservations, the court instructed the jury that Mr. Chavarin's actions would be "justified by duress or coercion" if it found (i) that Mr. Chavarin "was under an unlawful and present, imminent and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury to himself or a family member or others"; (ii) that Mr. Chavarin "had no reasonable, legal alternative to violating the law"; and (iii) that "a direct causal relationship could have been reasonably anticipated between engaging in the criminal action and avoiding the threatened harm." Vol. I at 201.

Given that Mr. Chavarin admitted to knowingly transporting drugs, both parties' closing arguments focused on whether the jury should believe Mr. Chavarin's testimony that he acted because of the alleged threats. For example, during its closing the United States argued that "not once in all of the time that Mr. Chavarin" was with the officers on the night of the arrest did "he ever say 'I am being forced to do this and I'm scared. I'm worried. Somebody has threatened me.' Not once does he say that." Trial Tr. at 275. The United States also pointed to the lack of specifics in Mr. Chavarin's story. *Id.* at 278.

By contrast, defense counsel claimed that Mr. Chavarin had "laid out all of the evidence. We know that that stuff happened. We know that his life and his family's life were in danger. We know that no matter what, he couldn't rely on his family being safe in Mexico." *Id.* at 287. He asked the jury to acquit Mr. Chavarin because his "actions were not voluntary." *Id.* at 288.

11

The jury convicted Mr. Chavarin as charged. *Id.* at 299.

**D.     Tenth Circuit Opinion**

In its order, the panel noted that "we are aware district courts must be afforded adequate discretion in their fact-finding capacity. After all, district courts hold an advantage in fact-finding where, as here, the sentencing enhancement is based upon trial proceedings they have personally observed. *See Gall v. United States*, 552 U.S. 38, 51–52 (2007)." (Dkt. No. 87 at 7.) Contrary to Mr. Chavarin's claim on appeal that the district court failed to specify the perjurious statements, the Tenth Circuit found that during sentencing the district court "repeatedly identified what it believed to be perjurious." (*Id.* at 8.) "We find the district court was unequivocal in identifying that is perjury finding encompassed the entirety of Chavarin's duress defense." (*Id.* at 9.)

In response to Mr. Chavarin's claim that the district court failed to make out the elements of perjury. The Tenth Circuit found that the district court more than met its burden on two of the three elements of showing that the testimony was false and given with intent to commit perjury. (*Id.* at 12-13.) The panel noted that while materiality was not explicitly addressed, Mr. Chavarin did not establish how he was prejudiced. (*Id*. at 14.) "Given the lack of facts corroborating any aspect of Chavarin's duress defense, a remand requiring the district court to more explicitly state the obvious would change nothing." (*Id.*)

The Tenth Circuit noted that "[i]ndependent of the jury verdict, the district court made findings where it emphasized it strongly believed Chavarin consciously gave false testimony during his duress defense," and it concluded that "[t]he district court properly applied the enhancement to safeguard the integrity of its proceedings." (*Id.* at 15.)

## **DISCUSSION**

The court must hold an evidentiary hearing "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  A petitioner must "allege facts which, if proved, would entitle him to relief." *Hatch v. Oklahoma*, 58 F.3d 1447, 1457 (10th Cir. 1995) (citations omitted).   "An evidentiary hearing is not necessary where a § 2255 motion contains factual allegations that are contradicted by the record, inherently incredible, or when they are conclusions rather than statements of fact." *United States v. Rogers*, 2014 WL 6977405, at *3 (D. Kan. Dec. 9, 2014), *certificate of appealability denied*, No. 6:10-CR-10186-01-JTM, 2014 WL 7384937 (D. Kan. Dec. 29, 2014), *appeal dismissed*, 599 F. App'x 850 (10th Cir. 2015) (unpublished), *cert. denied*, 136 S. Ct. 214 (2015), *reh'g denied*, 136 S. Ct. 579 (2015).

Akin to his perjurious testimony before Judge Benson during trial, Mr. Chavarin fails to provide factual support for the claims he asserts in support of his § 2255 motion. Moreover, Mr. Chavarin failed to raise these issues in the trial court or on direct appeal and, absent ineffective assistance of counsel on that issue, which is not alleged, he is procedurally barred from raising these claims now. Mr. Chavarin's allegations do not meet the legal threshold to establish ineffective assistance of counsel. But, even if he did, any failures of counsel do not justify setting aside his verdict because he was not prejudiced by such failures.

### A.    **Mr. Chavarin's Motion Should be Dismissed Because He Does Not Provide Evidence to Support his Allegations**

As this Court is aware, the Tenth Circuit Court of Appeals has held that conclusory allegations without supporting facts are insufficient to support a claim raised under § 2255. *See United States v. Fisher*, 38 F.3d, 1144, 1147 (10th Cir. 1994) (even when a defendant is *pro se*,

the Court is not required to fashion defendant's arguments for him where his allegations are merely conclusory in nature and without supporting factual averments).

Despite recognizing this standard in his memorandum to the court,[6] almost without exception, Mr. Chavarin's motion is devoid of supporting facts.  Unfortunately, this is a pattern with Mr. Chavarin, from his trial to the instant case.  The absence of factual assertions is glaring as Mr. Chavarin has provided no declaration in support of his motion, he rarely cites to any court record, and his motion was not filed under penalty of perjury.

Rule 2 of the Rules Governing Section 2255 Proceedings ("2255 Rules") requires that a motion to vacate, set aside, or correct a sentence must "state the facts supporting each ground" and must "be signed under penalty of perjury by the movant or by a person authorized to sign it for the movant."  2255 Rule 2(b)(2) and (b)(5).  District of Utah Civil Rule 5-3 provides that 2255 motions "must (i) be in writing, signed, and verified, and (ii) comply with" § 2255. DUCivR 5-3(a).  The requirement that a motion be signed under penalty of perjury is particularly important in this case as Mr. Chavarin has provided little evidence in support of his allegations. It is also important in this case, given that Judge Benson also found that Mr. Chavarin has an uneasy relationship with the truth, from his previous trial testimony.  In the absence of a motion containing specific facts signed under penalty of perjury, or a supporting declaration alleging specific facts, Mr. Chavarin's motion is insufficient to support his claims and, therefore, it should be dismissed.

---

[6] Mr. Chavarin notes, citing to *Holmes v. United States*, 876 F.2d 1545,1553 (1989), that a district court need not hold a hearing if the allegations are "patently frivolous," "based upon unsupported generalizations," or "affirmatively contradicted by the record." (Dkt. No 1 at 12.)

**B.    Mr. Chavarin's Motion Should be Dismissed Because His Claims are Procedurally Barred as They Were Not Raised on Direct Appeal**

In the § 2255 motion before the court, Mr. Chavarin raised eleven claims that were not raised on direct appeal. He claims for the first time that pretrial, trial, and sentencing counsel were ineffective.  "Section 2255 motions are not available to test the legality of a matter which should have been raised on direct appeal." *United States v. Cook*, 45 F.3d 388, 392 (10th Cir. 1995) (citing *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994)).  If an issue is not raised on direct appeal, the defendant "is barred from raising the issue in a § 2255 proceeding, unless he establishes either cause excusing the procedural default and prejudice resulting from the error or a fundamental miscarriage of justice if the claim is not considered." *United States v. Cox*, 83 F.3d 336, 341 (10th  Cir. 1996). *See also United States v. Frady*, 456 U.S. 152, 166 (1982) ("we have long and consistently affirmed that a collateral challenge may not do service for an appeal.").

To establish a fundamental miscarriage of justice, Mr. Chavarin must make a colorable showing of actual innocence.  *See Herrera v. Collins*, 506 U.S. 390, 404 (1993).  Because Mr. Chavarin has never argued he was actually innocent of the offense, he cannot meet the threshold requirement for establishing a fundamental miscarriage of justice. Indeed, in his opening argument at trial, Mr. Chavarin readily conceded he was transporting the 8.4 pounds of heroin when he was pulled over by Lieutenant Salas and told the jury "this is not a case of who did it or how it was done."  Mr. Chavarin took the stand and testified that he committed the offense. Accordingly, there is no "actua innocence" claim for which Mr. Chavarin can avail himself.

To establish actual innocence, a petitioner must demonstrate that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him. *Bousley v. United States*, 523 U.S. 614, 623 (1998).  "To be credible, such a claim requires petitioner to

15

support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.  Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Mr. Chavarin fails to present any new, reliable evidence to corroborate his duress defense and overcome the hurdle that no reasonable jury could have convicted him.

Furthermore, to establish "actual prejudice," a defendant must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170.  He fails to provide any substantive or factual basis upon which his trial was infected with error.  Plain and simple, the jury (and judge) completely disbelieved his attempt at a duress defense.

And none of the eleven claims of ineffective assistance raised in Mr. Chavarin's § 2255 motion were raised in this direct appeal and thus they were procedurally barred.[7]

### C.    Mr. Chavarin's Motion Should be Dismissed Because He Cannot Establish "Cause" or "Prejudice" Sufficient to Overcome the Procedural Bar

Cause sufficient to overcome a procedural bar may be established if a defendant can show his default was caused by "something external to the petitioner, something that cannot be fairly attributed to him."  *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).  "For example, 'a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that 'some interference by officials' . . . made compliance impracticable, would constitute cause under this standard."  *Id*. (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (cause for a

---

[7] The only issue raised on direct appeal was the applicability of the obstruction of justice sentencing enhancement as discussed above, and that is not included in his § 2255 Motion.

procedural default must ordinarily turn on a showing of some objective, external impediment preventing counsel from constructing or raising the claim on direct appeal).  Mr. Chavarin does not make any such argument.

Furthermore, Mr. Chavarin fails to allege that these claims were not raised on direct appeal because of ineffective assistance of counsel, which another way to get around an otherwise existing procedural bar. "[T]he question of cause for a procedural default does not turn on whether counsel erred or on the kind of error counsel may have made. So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington*, [466 U.S. 668, 687 (1984)], we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default." *Murray* at 477 U.S. at 488.  "A defendant may establish cause for his procedural default by showing that he received ineffective assistance of counsel in violation of the Sixth Amendment." *Cook*, 45 F.3d at 392.  *See also United States v. Galloway*, 56 F.3d 1239, 1241 (10th Cir. 1995).

Unfortunately, Mr. Chavarin's § 2255 motion addresses alleged deficiencies exhibited by counsel during pretrial, trial, and sentencing. It does not address ineffective assistance of appellate counsel. He does not acknowledge the existence of a procedural bar, let alone how he gets around it. Accordingly, his § 2255 motion should be dismissed.

**D.   Mr. Chavarin's Motion Should be Dismissed Because He Cannot Establish Ineffective Assistance of Counsel on any of his Eleven Claims**

Without waiving any of its previous arguments, the United States provides the following analysis of the ineffective assistance of counsel claims before this Court in an effort to promote judicial economy and efficiency. Simply put, the record before the Court fails to meet the *Strickland* standard.

### 1.    Legal Standard

To prevail on an ineffectiveness claim, a defendant must "'establish both that his attorney's representation was deficient and that he was prejudiced by that deficiency.'" *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000) (cited case omitted).  "An ineffective assistance claim may be resolved on either performance or prejudice grounds alone." *Id.* (citing *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir. 2000)).

Counsel's performance is deficient if the representation "falls below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

When reviewing claims of ineffective assistance of counsel, there is "'a strong presumption that counsel provided effective assistance, and a section 2255 defendant has the burden of proof to overcome that presumption.'" *Kennedy*, 225 F.3d at 1197 (quoting *United States v. Williams*, 948 F. Supp. 956, 960 (D. Kan. 1996)). Counsel's performance must be "completely unreasonable, not simply wrong." *Hooker v. Mullin*, 293 F.3d 1232 (10th Cir. 2002) (citing *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir.) *cert. denied*, 531 U.S. 938 (2000)). "The defendant [has] the burden of showing that counsel's action or inaction was not based on a valid strategic choice." *Bullock v. Carver*, 297 F.3d 1036, 1047 (10th Cir. 2002).  "A defendant may prevail on an ineffective assistance claim relating to trial strategy only if he can show counsel's strategy decisions would not be considered sound." *Jones v. Stotts*, 59 F.3d 143, 146 (10th Cir. 1995) (citing *Strickland*, 466 U.S. at 689, and quoting *Strickland* to note that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.").

The strong presumption that counsel's conduct falls within the range of reasonable professional assistance "derives from our common experience that attorneys, as a whole, usually represent their clients in a professional, competent, and reasonable manner." *Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002) (citing *Bell v. Cone*, 535 U.S. 685, 718 (2002) (Stevens, J., dissenting)).  Indeed, review of counsel's performance must be highly deferential, as "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689; see also *Harrington v. Richter*, 131 S.Ct. 770, 787-88 (2011) (noting the "challenger's burden" and the application of the *Strickland* standard "with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve"). Trial counsel has wide latitude in determining how to defend against a charge by the United States. *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) ("counsel has wide latitude in deciding how best to represent a client").

In the instant case, Mr. Chavarin's trial counsel represented his client in a "professional, competent, and reasonable manner," and Mr. Chavarin fails to demonstrate trial counsel's performance fell below an objective standard of reasonableness.  He also fails to demonstrate that the result of the proceedings would have been different. In each of the examples raised by Mr. Chavarin, he fails to demonstrate that any of the strategies employed by counsel would not be considered sound and that he was prejudiced as a result.

### 2.    Mr. Chavarin's Allegations

Mr. Chavarin alleges that counsel was ineffective before, during, and after trial. (Dkt. No. 1-1 at 12.) Without establishing "cause" and "prejudice" for each of his allegations below, Mr. Chavarin cannot raise them pursuant to 28 U.S.C. § 2255 and his motion should be dismissed.

Interestingly enough, the thrust of Mr. Chavarin's arguments is that he had no choice but to go to trial, much like he allegedly had no choice but to transport more than eight pounds of heroin. He states that counsel "persuaded," "pushed," and "pinned" him to proceed to trial, supposedly without informing him of any offer from the government any kind of legal strategy (Id. at 19, 21, 26, 32.) Indeed, Mr. Chavarin indicates that he was pressed to play the victim role at trial. (Id. at 22.)

### a.    Pretrial Context

Mr. Chavarin argues that counsel did not (1) communicate and provide information to Mr. Chavarin that he needed to assess the government's case-in-chief, including discovery and other evidence in order for him to make an informed decision as to whether to proceed to trial or plead guilty; (2) Conduct an adequate and independent pretrial investigation including interviewing any defense or government witnesses; and (3) attempt to negotiate a reasonable plea agreement with the government. (Id. at 17.)

As noted above, an ineffective assistance of counsel claim ordinarily requires a showing of both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-91 (1984). But when there has been an "actual breakdown of the adversarial process," prejudice is presumed. *United States v. Cronic*, 466 U.S. 648, 657, 659-60 (1984). This rule applies when there has been a "complete breakdown in communication between an attorney and client." *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir. 1988).

In deciding whether this occurred, this Court considers four factors: "(1) whether Appellant made a timely motion requesting new counsel"; "(2) whether the trial court adequately inquired into the matter"; (3) "'whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense'"; and "(4) whether

the defendant substantially and unjustifiably contributed to the breakdown in communication." *Romero v. Furlong*, 215 F.3d 1107, 1113 (10th Cir. 2000) (citation omitted). These factors give "general guidance" as to whether a complete communication breakdown occurred. *United States v. Lott*, 310 F.3d 1231, 1250 (10th Cir. 2002).

Here, Mr. Chavarin is not entitled to presumed prejudice. He cannot meet any of the factors outlined in *Romero*. Communication problems with Mr. Chavarin did not result in a timely motion to request new counsel, which never gave the trial court an opportunity to investigate the matter. Given that Mr. Chavarin's defense involved his decision to take the stand, he cannot claim that there was a "total lack of communication" with counsel even if that communication was not as frequent as he would have liked. Finally, based on the communicate that the United States had with counsel for Mr. Chavarin, it appears that Mr. Chavarin may have played some role in any communication deficit he may have experienced with counsel. He may have provided conflicting messages, or at least changing messages, to counsel, regarding how he would like to resolve his case. Based on representations that Mr. Chavarin was interested in pleading, the United States sent a proposed Statement in Advance of Plea to him, which he rejected. *See* Exhibit B. Mr. Chavarin was then concerned about an applicable §851 sentencing enhancement  in his case if he didn't accept the plea, and the United States indicated that whether he wanted to take the plea or go to trial was up to him, but that it would not be filing the §851 to incentivize the plea. *Id.*

Mr. Chavarin opted to proceed to trial.

Mr. Chavarin argues that counsel did not attempt to negotiate a reasonable plea deal with the United States. That is simply not true. Counsel for Mr. Chavarin and the United States  engaged in plea negotiations. At a minimum, the motions to continue that were filed in the case reference the parties' plea negotiations. (*See, e.g.* Docket No. 21 at 2 (filed February 1, 2017; *see also* Docket

No. 23 at 2 (filed March 27, 2017); Docket No. 25 at 2-3 (filed May 16, 2017); and Docket No. 28 at 2-3 (filed July 6, 2017).)

During that four month period, while the plea negotiations were ongoing, the tentative negotiations included a discussion about likely guidelines calculations and the ten-year mandatory minimum sentence.  Specifically, a draft plea agreement sent by the United States included a potential base offense level of 32, a recommended three-level departure for acceptance of responsibility along with the potential for an additional two level departure for minor role.  This would have resulted in a Total Offense Level of 25.  The parties understood, however, that the charge carried a ten year mandatory minimum sentence, for which Mr. Chavarin would have no relief. See Exhibits A and B (Emails between AUSA Stewart Young and Rudy Bautista, dated 3.27.17 and 5.3.17). Mr. Chavarin's anticipated criminal history score precluded him from receiving safety-valve, which would have provided potential relief from the ten year mandatory minimum in his case. Additionally, the government indicated that it would not file an enhancement to Mr. Chavarin's sentence under 21 U.S.C. § 851, which, at the time, would have increased his sentence to a 20-year mandatory minimum.  Given the applicable mandatory minimum in the case, the parties never came to any agreement, and therefore no deal was reached, and Mr. Chavarin opted to take his chance with the jury instead of pleading guilty.

Mr. Chavarin asserts that "there was at no time any discussion of a plea." (Dkt. 1-1 at 26.) Based on the representations that counsel made to the United States, that statement appears to be false. Obviously the United States is not privy to the communication between Mr. Chavarin and his counsel. But the United States does take counsel at his word and, based on the email exchanges with counsel attached as Exhibit A and B, believed that counsel was communicating the plea offers to Mr. Chavarin as the rules of professional responsibility require.

Mr. Chavarin alleges that counsel was ineffective because he did not interview witnesses for the defense or government. The United States notes that, as a practical matter, its witnesses are not available for "interviews" by defense counsel prior to trial. In terms of not interviewing defense witnesses, it is not at all clear who counsel was supposed to interview. As noted above, Mr. Chavarin was unable to provide any helpful names or identifying information about the individuals who supposedly threatened him. He claimed he knew "Chewy" or "Jesus Gonzalez." (Dkt. No. 87 at 3 and 4.)

Related to this issue is Mr. Chavarin's argument in the trial context that counsel was ineffective because he did not subpoena or call any defense witness (other than, of course, Mr. Chavarin himself). (Dkt. 1-1 at 30.) He notes that counsel could have called Mr. Chavarin's then-girlfriend or family to testify, but that counsel made a strategic decision not to call family members because it would "hurt Chavarin more." (Id.) That decision is the essence of the kind of strategic decision with which counsel are given a wide-degree of latitude without second-guessing. *See Yarborough,* 540 U.S. at 5-6.

Finally, this was a courier case involving heroin. This was not a wire investigation of a distribution conspiracy involving voluminous discovery. In the limited universe of discovery for Mr. Chavarin's case there were some reports related to the traffic stop and Mr. Chavarin's post-*Miranda* interview. There was dash-cam video. There were the drugs and the laboratory report from their testing.  The United States met its discovery obligations in this case and assumed that counsel shared that information with Mr. Chavarin. But even if he didn't, Mr. Chavarin lived through the traffic stop. He watched the search of the rental vehicle. He knew about the drugs. Even if counsel had failed to show some, or even all, of the discovery with his client, it is not clear that meets the threshold for being outside the scope of objective professional conduct. And even

23

if it were, this is not a case where that failure, if it happened, would have prejudiced Mr. Chavarin and his ability to make a reasonable and informed decision about whether to take a plea deal from the government or go to trial. He was well-aware of what happened.

**b.      Trial Context**

Mr. Chavarin alleges that counsel did not (1) convey his trial strategy and inform Mr. Chavarin of any affirmative defense; (2) prepare for trial and research the applicable law and review the discovery  provided by the government; (3) Subpoena or call any defense witnesses (4) Lodge proper objections, and (5) act as an effective advocate at trial. (Dkt. 1-1 at 29.)

Counsel appropriately conducted trial and provided effective assistance to Mr. Chavarin's defense.  As to the first allegation about an "affirmative defense," Mr. Chavarin's entire § 2255 and trial actions belies this complaint.  Indeed, Mr. Chavarin's entire defense was based on an "affirmative defense" – his failed claim of duress to justify his trafficking more than eight pounds of heroin.  Mr. Chavarin's claim, at this late stage, that his counsel failed to convey any affirmative defenses is utterly confusing and lacking merit, given that Mr. Chavarin himself conjured up the duress defense and advocated that at trial.

As to whether counsel adequately prepared for trial and reviewed discovery, it is clear that counsel had great familiarity with the facts and circumstances of the case.  Indeed, counsel effectively cross-examined the government witnesses, and effectively conducted a direct exam (often engaging in leading) of Mr. Chavarin.  Judge Benson even noted this effective direct exam of Mr. Chavarin by counsel.  Mr. Chavarin fails to provide any factual basis for his claim that his counsel failed to adequately prepare for trial, especially based on the trial transcript and complete record before this Court.

Mr. Chavarin also complains that his counsel failed to subpoena defense witnesses.  At trial, Mr. Chavarin provided only one other name that *might* have information relating to his duress, named "Chewy" or Jesus Gonzales.  Indeed, no other person listed by Mr. Chavarin had any direct knowledge of the duress (if Mr. Chavarin is even to be believed).  And it is very unlikely that "Chewy" would be willing to testify on Mr. Chavarin's behalf (if he could be found, or if he is even a really person).  Furthermore, it is clear that Mr. Chavarin engaged in subterfuge and perjurious conduct before Judge Benson, and it is highly unlikely that counsel desired to have anyone else lie (or face potential perjury charges) before the Court.  Indeed, counsel's decision to not subpoena any other witnesses to attempt to bolster Mr. Chavarin's lies was a wise choice, and Mr. Chavarin fails to point to any actual facts that belie this point.

Mr. Chavarin's fourth trial complaint is that his counsel failed to lodge proper objections. It appears that Mr. Chavarin's objection complaint is actually about the sentencing and the obstruction enhancement, rather than objections at trial.  In any event, it is clear that counsel filed a brief indicating that the obstruction enhancement should not apply.  He further filed objections to the PSR.  Thus, this contention is unpersuasive.

Finally, Mr. Chavarin complains that his counsel failed to act as an effective advocate at trial.  It is clear that counsel prepared for trial, given that he knew the facts, provided an effective opening statement, examined witnesses, and provided an effective closing statement.  Mr. Chavarin provides no facts otherwise, other than his bald assertion that counsel failed to prepare him for trial.  Given that counsel effectively led Mr. Chavarin throughout his testimony, this contention about preparation is both confusing and apparently false.  Indeed, his defense, while not meritorious, nonetheless did not rise to the level of ineffective.  Furthermore, Mr. Chavarin has not, and cannot, demonstrate that any ineffectiveness, if actually demonstrated, would have

resulted in a different proceeding. Ultimately, Mr. Chavarin's problem is not with his trial counsel, but with the fact that jury (and judge) clearly didn't accept his duress defense.

### c.      Sentencing Context

Mr. Chavarin alleges that counsel did not (1) review, discuss, or explain the Presentence Report ("PSR"); (2) object and argue for mitigation of Mr. Chavarin's sentence; and (3) argue that Mr. Chavarin's sentence was substantively unreasonable. (Dkt. No. 1-1 at 31.) As a result, Mr. Chavarin suggests that he received ineffective assistance of counsel and was denied a fair and just sentence. (Id.)

Whether counsel met with Mr. Chavarin to discuss the PSR after a guilty verdict at trial is not determinative as to whether Mr. Chavarin received effective assistance of counsel during sentencing. Regardless of whether counsel met with Mr. Chavarin to review the PSR, counsel upheld his professional obligations to advance his clients' interests at sentencing. He filed three substantive objections to the PSR. (Dkt. No. 59-1.) Counsel also filed a twelve page sentencing memo that extensively discussed the mitigating circumstances impacting Mr. Chavarin's criminal conduct, most significantly his heroin addiction. (Dkt. No. 64.) Significantly, counsel argued that, notwithstanding the sentencing guideline range established in the PSR, and to which counsel had already objected, Judge Benson should depart downward from the sentencing guidelines range and sentence Mr. Chavarin to 121 months. (Dkt. No. 64 at 6-12.)

At sentencing, counsel amplified the argument from the sentencing memorandum that, notwithstanding the guidelines established in the PSR, the court should exercise its discretion and grant a downward departure in Mr. Chavarin's case. (Dkt.  No. 78 at 4-9.) Counsel book-ended those arguments with a mitigation argument that discussed the role played by Mr. Chavarin  as a "mule" or runner for a large drug trafficking organization. (Id. at 3-4 and 7.)

Counsel recognized the ten-year mandatory minimum in Mr. Chavarin's case and asked Judge Benson to impose that lowest sentence based on his vulnerabilities, relative lack of criminal history, and the fact such a sentence would serve as adequate deterrence. (Id. at 8-9).

Mr. Chavarin suggests that "some other attorney" filled in for lead counsel at sentencing without Mr. Chavarin's spproval or knowledge. That "other attorney" was an attorney of record in Mr. Chavarin's case who worked with lead counsel to prepare for trial. Mr. Chavarin, other than expressing that he did not approve of her, does not allege this attorney's presence and argument caused him prejudice.

There is no question that Judge Benson was not swayed by the advocacy provided by Mr. Chavarin's counsel at sentencing. Judge Benson adhered to the guidelines provided in the PSR and imposed a sentence of 188 months, which was the low end of the guideline range, instead of 121 months as requested by Mr. Chavarin's counsel. Clearly, Mr. Chavarin received a higher sentence than he would have preferred. But the question before this Court is whether that higher sentence is because Mr. Chavarin received ineffective assistance of counsel at sentencing. The United States submits that it is not.

That Judge Benson disagreed with the arguments advanced by counsel in its sentencing memorandum and at the sentencing hearing, and imposed a sentence based on the PSR provided by the U.S. Probation Office, does not mean that counsel for Mr. Chavarin provided ineffective assistance.  Nor does the fact that counsel allegedly returned $1,000 remaining from the client trust fund provide evidence or any kind of acknowledgment by counsel that the representation provided during the sentencing phase of Mr. Chavarin's criminal case fell below an objective standard of reasonableness or was not sound.

Finally, while counsel did not specifically use the phrase "substantively unreasonable" to argue against the guideline range proffered in the PSR, counsel offered the court a number of arguments about why a sentence in the range of 188 to 235 months went well-beyond the "harsh" and "stiff" penalty of the mandatory minimum in the case. Counsel further argued before Judge Benson that such a high sentence was not justified based on the facts in this case. (Id. at 8 and 9.) Counsel argued that Mr. Chavarin's culpability in the case, including the fact that he took responsibility for having the drugs in his car, the jury spent a number of hours deliberating in his case, his vulnerabilities that led him to transport the drugs, and his minimal criminal history, all made anything other than the ten year mandatory minimum unreasonable. (Id. at 9.)

The sentence imposed by the district court was based on the PSR and the district court's observations during trial. Indeed, Judge Benson clearly noted Mr. Chavarin's perjurious conduct at trial, along with his egregious conduct as a narcotics trafficker. Judge Benson's sentence was 188 months because of what he saw from Mr. Chavarin, not because counsel's performance somehow fell below *Strickland*'s standard of objective reasonableness.

## **CONCLUSION**

For all of these reasons, the United States respectfully requests that the court dismiss Mr. Chavarin's motion to vacate his sentence pursuant to 28 U.S.C. § 2255.

DATED this 11th day of December, 2020.

JOHN W. HUBER
UNITED STATES ATTORNEY


*/s/ Jennifer E. Gully*
STEWART M. YOUNG
JENNIFER E. GULLY
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I state that on December 14, 2020, my assistant submitted this filing via the Unitd States Postal Service to:

Alan Eduardo Chavarin
Reg. No. 24900-081
FCI Safford
Federal Correctional Institution
P.O. Box 9000
Safford, Arizona 85548

s/*Jennifer E. Gully*
Jennifer E. Gully